Hon. Ricardo S. Martinez

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Nos.   CR08-296-RSM |
| | ) | CR09-391-RSM |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | UNITED STATES' |
| MATTHEW G. KRANE, | ) | SENTENCING MEMORANDUM |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## I. INTRODUCTION

The United States of America, by and through Jenny A. Durkan, United States Attorney for the Western District of Washington, and undersigned counsel for said District, files its sentencing memorandum regarding Matthew Krane in both Case Nos. CR08-296RSM and CR09-391RSM.  On December 10, 2009, Mr. Krane entered pleas of guilty pursuant to Rule 11(c)(1)(C) to one count of Tax Evasion, in violation of 26 U.S.C. § 7201, in CR08-296RSM, and one count of False Statement in a Passport Application, in CR09-391RSM.  The Plea Agreements entered in these cases stipulated that the United States would seek a combined sentence of no more than 60 months.  The pleas were conditioned upon the Court accepting the sentencing range.

On January 28, 2011, this Court sentenced Mr. Krane's co-defendants in CR08-296, Jeffrey Greenstein and Charles Wilk, to 50 months for their orchestration of a massive tax shelter fraud.  The United States recommends that the Court accept the Plea Agreements and sentence Mr. Krane also to a total of 50 months for both offenses.  As set

1  forth in more detail below, the nature and characteristics of the offender and the offense

2  necessitates a significant term of incarceration.  As a tax attorney with a long and

3  lucrative career, Mr. Krane of all individuals should have known better than to evade

4  taxes on approximately $36 million in income, and betray his own client in the process.

5  As of the filing of this sentencing memorandum, Mr. Krane has not repaid the IRS or

6  made his former client whole for the egregious breach of fiduciary duty.  If, however,

7  circumstances change prior to sentencing, the United States reserves the right to

8  supplement its memorandum and update its recommendation.

9  ## II.  CASE HISTORY

10         Matthew Krane had been charged with a host of offenses stretching from the

11  Central District of California to the Western District of Washington.  This section briefly

12  sets forth the lengthy procedural history regarding the various cases filed against Mr.

13  Krane and details their disposition pursuant to the Plea Agreements.

14         On May 28, 2008, a Grand Jury in the Western District of Washington returned an

15  Indictment charging Matthew Krane with one count of Conspiracy to Launder Monetary

16  Instruments, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).  This case was docketed as Case

17  No. CR08-296 RSM.

18         On August 1, 2008, a Grand Jury in the Central District of California returned a

19  two-count Indictment charging Matthew Krane with False Statement in a Passport

20  Application, in violation of 18 U.S.C. § 1542; and Aggravated Identity Theft, in violation

21  of 18 U.S.C. 1028A(a)(1).  This case was assigned Case No. CR08-912DSF, before Hon.

22  Dale Fischer of the District Court for the Central District of California.

23         At the time of the California Indictment for passport fraud, special agents for the

24  State Department in San Francisco, California had also determined that Mr. Krane had

25  unlawfully obtained a second, false U.S. Passport through a passport expediting service in

26  the Northern District of California using the identity of M.S.M..

27         On June 4, 2009, an 18-count Superseding Indictment was returned by a Grand

28  Jury in the Western District of Washington in Case No. CR08-296RSM, adding tax fraud

1   conspiracy and mail fraud charges against co-defendants Jeffrey Greenstein and Charles

2   Wilk  Mr. Krane was not named as a defendant in the tax fraud and mail fraud charges.

3           On September 18, 2009, another Grand Jury in the Central District of California

4   returned a separate seven-count Indictment against Matthew Krane, charging him with

5   evasion of tax and false returns in violation of 21 U.S.C. §§ 7201 and 7206(1) for the tax

6   years 2001 through 2007.  The case was docketed as Case No. CR09-953DSF, assigned

7   again to Judge Fischer of the District Court for the Central District of California.

8           On November 3, 2009, pursuant to Rule 20, Mr. Krane consented to the removal of

9   the California passport fraud offenses (CR08-912DSF) to this District for disposition, and

10  the case was docketed here as Case No. CR09-391, and assigned to this Court.  On

11  November 29, 2009, the United States filed a one-count Superseding Information in Case

12  No. CR08-296RSM, charging Mr. Krane with Tax Evasion for the tax year 2002.  The

13  guilty pleas with respect to Case Nos. CR09-391 and CR08-296 were then entered on

14  December 10, 2009.  Pursuant to the two Plea Agreements, the United States agreed to

15  the following conditions:

16  •   to seek a sentence no higher than 60 months for both cases;

17  •   dismiss all remaining charges at the time of sentencing, including the
18      Money Laundering Conspiracy Charge in the Western District of
        Washington case, the remaining Aggravated Identity Theft charge from the
        Central District of California, and all the tax offenses originally charged in
19      the Central District of California under Case No. CR09-953DSF;

20  •   and finally the United States Attorneys Office for the Northern District of
        California promised not to pursue the second passport fraud offense
21      involving the actual issuance of a false passport.

22  In return for these promises, Mr. Krane agreed to cooperate, but with the express

23  understanding that no motion pursuant to USSG § 5K would be filed by the United States.

24          Consistent with the Plea Agreements, on November 16, 2010, pursuant to Rule 21,

25  the District of California Case No. CR09-953, was removed to this District for the sole

26  purpose of facilitating its dismissal at the time of sentencing.  This case was docketed

27  here in the Western District of Washington as Case No. 10-351, and assigned to this

28  Court.  In fulfillment of its promises, the United States will file in advance of sentencing

1  a motion to dismiss Case No. 10-351 with prejudice.

2  ### III.  OFFENSE CONDUCT

3  **A.     Defendant's Education and Experience in Tax Law.**

4           Defendant Matthew Krane had the benefit of an elite education and a long,

5  lucrative career in tax law.  His expertise and success as a tax lawyer led his client, Haim

6  Saban, to place complete reliance and trust on Mr. Krane with respect to tax matters.  It

7  was this reliance and trust that Mr. Krane ultimately leveraged and exploited to commit

8  the instant offenses.

9           Matthew Krane received his law degree from Harvard Law School in 1980.  After

10  graduation, Mr. Krane joined the Beverly Hills law firm of Pollock Bloom & Dekon

11  where he practiced tax law for more than ten years.  It was there that Mr. Krane first met

12  and began to work for Haim Saban.  In the early 1990's, Mr. Krane left the firm for solo

13  practice, retaining Mr. Saban as a client.  Eventually, Mr. Saban became Mr. Krane's

14  largest client, and Mr. Krane advised and represented him on a whole host of personal

15  and business tax matters.  Haim Saban's faith in Mr. Krane was exemplified by his

16  appointment as trustee to the Saban childrens' trusts.

17  **B.     The "Titanium" and "Silverlight" Tax Shelters.**

18           Sometime in late 2000, Haim Saban informed Matthew Krane that he was selling

19  his considerable stake in a business entity known as Fox Family World Wide (hereinafter

20  "FFWW"), and instructed Mr. Krane to explore ways to shelter the gains from the sale.

21  The proceeds of the sale ultimately totaled $1.5 billion.

22           In early 2001, Mr. Krane met with Charles Wilk of Quellos to discuss tax shelters.

23  Mr. Wilk offered to Mr. Krane the tax shelter concept that this Court knows as "POINT,"

24  but was known eventually to Mr. Saban and his representatives as "Titanium."  According

25  to Mr. Wilk, Mr. Saban could purchase a partnership entity into which a foreign

26  investment fund had contributed a depreciated portfolio of technology stocks.  As with

27  the other shelters that Quellos sold, Mr. Wilk represented that Mr. Saban could sell his

28  shares of FFWW contemporaneously with the depreciated technology stocks and use the

1  losses from the stocks to offset the gains from the sale of FFWW.

2      Mr. Krane relied on Mr. Wilk's representations regarding the bona fides of the

3  foreign investment fund and the existence of the depreciated technology stocks.  There is

4  no evidence to establish that Mr. Krane was aware of the fact that the foreign investment

5  fund and the purported technology stocks were fictitious.

6      At the same time Mr. Krane was evaluating various tax shelters, including the one

7  offered by Quellos, he devised a tax strategy of his own to shelter the anticipated FFWW

8  gains.  Mr. Krane's strategy came to be known as "Silverlight."  Mr. Krane determined

9  that he could combine the Quellos POINT tax shelter with his custom designed strategy,

10  resulting in Mr. Saban paying no taxes on the entirety of the $1.5 billion sales proceeds.

11  **C.    Krane's Secret Payment Scheme.**

12      Once Matthew Krane determined that he could integrate his own tax shelter with

13  that offered by Quellos, he devised a scheme to extract for himself tens of millions of

14  dollars of his client's money without the client's knowledge.  Mr. Krane approached Mr.

15  Wilk with a plan in which Quellos would falsely present to Haim Saban the entire tax

16  shelter package, both the Titanium and Silverlight portions of the plan, as having been

17  devised by Quellos and their associates, and to seek substantial fees for the work.  In

18  return, Mr. Krane demanded that Quellos secretly kickback to him a major portion of the

19  fees.  Mr. Krane made it clear that unless Quellos agreed to this scheme, Mr. Krane would

20  not allow Quellos to receive Mr. Saban's business.  Mr. Wilk agreed to participate.

21      At Matthew Krane's recommendation, Haim Saban agreed to implement Titanium

22  and Silverlight, and pay Quellos a fee of approximately $46 million.  Mr. Saban also

23  agreed to pay Euram, Quellos's co-conspirators in the fraudulent POINT tax shelter, an

24  additional fee of approximately $7.7 million for advisory services.  Unbeknownst to Mr.

25  Saban, Quellos diverted approximately $36 million of the total amount of fees paid by

26  Mr. Saban to a foreign bank account in Austria.  The account was opened in the name of

27  "QFS Consulting," to confuse and mislead those who observed the movement of money

28  into believing that the funds were for the benefit of Quellos.  In truth, the account was

1    opened for the benefit of Matthew Krane.

2    **D.    Krane's Evasion of Tax.**

3            In 2002, Matthew Krane caused $35.9 million to be transferred from the Austrian

4    bank account in the name of QFS Consulting to another account at the same Austrian

5    bank in the name of Goldfleugel.  Mr. Krane had sole signatory control over this

6    Goldfleugel account.  Mr. Krane did not disclose the existence of the account, nor report

7    this income in his tax return for the tax year 2002.  Instead, Mr. Krane filed and continued

8    to file annual tax returns falsely omitting this income.

9    **E.    Krane's Passport Fraud.**

10           On October 16, 2007, IRS Special Agents contacted Matthew Krane at his

11   residence in Los Angeles, California in connection with a subpoena.  As a result of this

12   contact, Mr. Krane became aware that law enforcement sought information regarding his

13   involvement in the POINT tax shelter and, specifically, his connections to the entity, QFS

14   Consulting.

15           On March 19, 2008, law enforcement executed a duly authorized search warrant

16   for Matthew Krane's Los Angeles home.  During the search, agents seized, among other

17   things, a fake application for a passport as well as an actual passport, both in false

18   identities.  Specifically, the agents found in Mr. Krane's home: (1) a completed

19   application for a passport in the name of C.T.S., listing a Social Security Number and date

20   of birth that was not Mr. Krane's but bearing Mr. Krane's picture; (2) a genuine

21   California Driver's License in the name of C.T.S., but bearing Mr. Krane's picture; (3) a

22   state of California birth certificate for C.T.S.; (4) travel itinerary under the name of C.T.S.

23   for travel to Germany; and (5) a genuine United States passport in the name of M.S.M,

24   but bearing the picture of Matthew Krane, issued out of San Francisco, California on or

25   about March 10, 2008.

26                    **IV.  SENTENCING GUIDELINES CALCULATIONS**

27           The Sentencing Guidelines are advisory.  *United States v. Booker*, 543 U.S. 220,

28   245-46 (2005).  However, "the district courts still must consult [the] Guidelines and take

United States' Sentencing Memorandum/ – 6
CR08-296RSM & CR09-391RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   them into account when sentencing. . . ."  *United States v. Cantrell*, 433 F.3d 1269, 1279

2   (9th Cir. 2006) (internal citations omitted, internal quote omitted).  "The appropriate

3   guidelines range, though now calculated under an advisory system, remains the critical

4   starting point for the imposition of a sentence under § 3553(a)."  *United States v. Mashek*,

5   406 F.3d 1012, 1016 n.4 (8th Cir. 2005) (quoted approvingly in *Cantrell*, 433 F.3d at

6   1279).

7          Since Matthew Krane has been convicted of two separate offense (Passport

8   Application Fraud and Tax Evasion) which did not involve substantially the same harm or

9   a similar set of facts, the combined offense level should be determined according to

10  USSG § 3D1.4.  Therefore, we first turn to calculating the applicable Sentencing

11  Guidelines range for the Passport Application Fraud offense:

12

13              Base Offense Level, pursuant                 8
                USSG § 2L2.2.
14              _____

15              Adjusted Offense Level                       8

16          The Probation Office in its Pre-Sentence Report recommended an additional four

17  levels pursuant to USSG § 2L2.2(b)(3), because Mr. Krane had successfully obtained a

18  fraudulent passport in the name of M.S.M.  However, the passport application that is the

19  subject of the charge of conviction was in the identity of C.T.S., and any charges related

20  to the passport in the identity of M.S.M. was, as part of the plea agreements, abandoned.

21  Therefore, for the purposes of calculating the applicable Sentencing Guidelines range for

22  the charges of conviction, the United States believes that the application of the additional

23  four levels would be inappropriate.

24          The calculation for the Tax Evasion offense is recommended to be as follows:

25              Base Offense Level, pursuant                 26
                to USSG § 2T1.1,
26              and 2T4.1(K), because tax loss is
                more than $7 million (calculated at
27              20% of $36 million)

28              Specific Offense Characteristic pursuant     +2
                to USSG § 2T1.1(b)(1), because Defendant

| | | |
|---|---|---|
| failed to report the source of income exceeding $10,000 in any year from criminal activity | | |
| Specific Offense Characteristic pursuant to USSG § 2T1.1(b)(2), because the offense involved "sophisticated concealment." | + 2 | |
| Abuse of Position of Trust, pursuant to USSG § 3B1.3, because Defendant was able to commit this offense as a result of his position as Haim Saban's tax attorney | + 2 | |
| Adjusted Offense Level | 32 | |

Pursuant to USSG § 3D1.4, because of the disparity between the two offense levels, the greatest of the two offense level is simply taken without any further adjustments. The final calculation, taking into account the Acceptance of Responsibility Adjustment, results as follows:

| | |
|---|---|
| Adjusted Offense Level | 32 |
| Acceptance of Responsibility pursuant to USSG § 3E1.1(a) and (b) | -3 |
| Total offense Level | 29 |

Because the Defendant has no criminal history, the applicable sentencing range is 87-108 months. The rationale for the government's calculations are set forth below.

**A.    Base Offense Level for the Tax Offense..**

The Plea Agreement relevant to the Tax Evasion offense did not determine a stipulated tax loss amount. Application Note (A) to USSG § 2T4.1 specifies that where the tax loss amount has not been determined with specificity, the tax loss shall be treated as equal to 20% of the gross income less any tax withheld or otherwise paid. The Plea Agreement stipulates that Matthew Krane in 2002 had the benefit of $35.9 million, none of which he disclosed on his 2002 tax return. Pursuant to the Application Note, the assumed tax loss is then equal to just over $7 million. Therefore, in accordance with the Tax Loss Table, the Base Offense Level is 26.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**B.    Specific Offense Characteristics.**

     *1.    Krane Evaded Tax on Income Derived from Criminal Activity.*

     Matthew Krane received his unreported income as a result of engaging in a fraud perpetrated on his own client.  Mr. Krane obtained the money by lying to Mr. Saban as to the true purpose of the fees, thus depriving Mr. Saban of advise in a very risky matter free of conflict and self-dealing.  As a result, the application of the Specific Offense Characteristic USSG § 2T1.1(b)(1) is appropriate in this case.

     *2.    Sophisticated Concealment.*

     Section 2T1.1 (b)(2) provides for an additional two points where the conduct involved "sophisticated concealment."  Application Note 3 provides that the enhancement applies where "deliberate steps are taken to make the offense, or its extent, difficult to detect" including the use of "fictitious entities, corporate shells, or offshore bank accounts."

     In this case, Matthew Krane utilized offshore bank accounts in the name of shell entities such as QFS Consultants and Goldfleugel to hide his money.  Therefore, the two point enhancement is warranted.

**C.    Abuse of Trust.**

     Section 3B1.3 provides for an increase of two levels where the defendant abused a position of private trust.  Application Note 1 explains that private trust refers to a position "characterized by professional or managerial discretion" and the enhancement is appropriate where this trust "contributed in some significant way to facilitating the commission or concealment of the offense."

     In this case, Matthew Krane was a long-time tax attorney to Haim Saban and was entrusted with selecting and implementing a tax strategy for the benefit of his client, free from conflict and self dealing.  Because of the trust and discretion Mr. Saban placed in Matthew Krane, Mr. Saban did not think to question with diligence the level of fees or the manner in which the fees were dispensed and structured.  Haim Saban's trust was exploited and made possible the funneling of the money to an offshore account in the

1    name of a shell entity where the IRS would have difficulty connecting the income to him.

2    Therefore, the abuse of trust enhancement is warranted.

3                        **V.  SENTENCING RECOMMENDATION**

4        The applicable sentencing guidelines range for Matthew Krane -- i.e. the "critical

5    starting point for the imposition of a sentence under § 3553(a)" -- is a term of

6    imprisonment of 87-108 months.  The United States recommends a sentence of 50

7    months, followed by two years of supervised release.  This sentence represents a major

8    variance from the applicable guidelines range, as well as a variance from the top of the

9    agreed upon sentencing range pursuant to the Plea Agreements.  This sentence also

10   satisfies the other § 3553 factors.

11   **A.    Nature of the Offense and Characteristics of the Defendants.**

12       Section 3553(a)(1) requires the Court to consider "the nature and circumstances of

13   the offense and the history and characteristics of the defendants."  This factor warrants a

14   significant term of incarceration in this case.

15       The nature and circumstances of Matthew Krane's offenses are egregious.  Here,

16   the defendant evaded paying tax on nearly $36 million in income, a staggering sum.

17   Moreover, the underlying conduct involved a shocking betrayal of a client who had so

18   trusted the defendant that he was made the trustee for the clients' children.  Finally, the

19   passport fraud offense appeared linked to an attempt to flee the jurisdiction in light of the

20   investigation.  Documents confirming travel plans to Europe in one of the false identities

21   were recovered with the false passport materials.

22       Neither do the history and characteristics of the defendant mitigate the serious

23   nature of these offenses.  To the contrary, they exacerbate the conduct.  Matthew Krane of

24   all individuals knew better than to cheat on his taxes.  Mr. Krane was a licensed attorney

25   with a long, lucrative career in tax law.  Moreover, he was already a wealthy man by any

26   measure before he cheated his client and the IRS.  Indeed, just in the year 2001, after the

27   completion of the sale of FFWW, Mr. Krane was gifted an additional $3 million by his

28   client on top of his regular fees.  The only motivation for the defendant's crimes, then,

1  appears to have been sheer greed and malice toward his client.

2  **B.      Deterrence.**

3         Section 3553(a)(2)(a) requires the Court to impose a sentence that reflects the

4  "seriousness of the offense, to promote respect for the law, and to provide just

5  punishment for the offense."  Only the imposition of a significant term of incarceration

6  would adequately promote these goals of deterrence.  Too often, cheating on one's taxes

7  is accepted by the public as a victimless crime, without serious consequences; and is even

8  perceived by some as something that the government "deserves."  This Court knows that

9  is not the case and should continue to send the message that cheating on one's taxes,

10 especially by those who have taken it upon themselves to advise others as to the meaning

11 of the tax laws, will not be tolerated.

12 **C.      Kinds of Sentence Available**.

13        No mandatory minimums apply in this case.  Once the Plea Agreements are

14 accepted by the Court, it is bound by the upper range of 60 months for both offenses.

15 **D.      Sentencing Guidelines Range**.

16        As indicated above, the applicable guidelines range according to the government's

17 calculation is 87-108 months.  The recommended sentence is a significant variance

18 downward from the applicable range.

19 **E.      Recommended Sentence in Line with Other Sentences.**

20        Section 3553(a)(6) cautions the Court to avoid unwarranted sentencing disparities

21 between similarly situated defendants who have been found guilty of similar conduct.  Of

22 note is this Court's 50 month sentences for Jeffrey Greenstein and Charles Wilk, the

23 masterminds of the core tax scheme.  Although Mr. Krane's charged conduct is somewhat

24 different, given the sentences for Messrs. Greenstein and Wilk, a proportional sentence

25 for Mr. Krane require that it be at most on par with the two other defendants and not

26 more.

27        Mr. Krane, as part of the Plea Agreements, had also agreed to cooperate by

28 providing, among other things, statements to the government regarding his dealings with

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  his former co-defendants, Charles Wilk and Jeffrey Greenstein.  Mr. Krane did so, and

2  provided a truthful account of his involvement in the POINT tax shelter, as well as how

3  his secret payments from Quellos to his account in Austria was agreed upon and arranged.

4  Mr. Krane also provided additional records to the government, explained other records

5  already in the possession of the government, and assisted in sorting through privilege

6  issues that arose in connection with the production of electronic evidence seized from Mr.

7  Krane's computer.  Finally, Mr. Krane was cooperative and willing to testify fully and

8  truthfully in the event that he may have been called as a witness during the trial of

9  Messrs. Greenstein and Wilk.

10          The recommended sentence of 50 months is also fair and proportional to sentences

11  given to cooperators in similar situations.  Because of the substantial benefits that Mr.

12  Krane was already given as a result of the Plea Agreements, the United States expressly

13  noted that no motion pursuant to USSG 5K1.1 would be forthcoming in this case.  That is

14  because even though the applicable guidelines are at 87-108 months, the United States

15  already limited its ability to seek a sentence higher than 60 months.  And the

16  recommended sentence of 50 months is even lower than the agreed upon upper limit.

17  Moreover, Mr. Krane received additional up-front benefits when the Northern District of

18  California promised not to charge him with an additional passport fraud count, a charge

19  that would have carried more serious penalties than the current passport charge because in

20  that other case, Mr. Krane actually succeeded in obtaining a false passport.  Therefore, the

21  recommended sentence is proper and in line with other sentences given for similarly

22  situated defendants.

23  **F.    Restitution.**

24          To date, Mr. Krane has not paid the IRS the tax due and owing on the nearly $36

25  million in income that he obtained in 2002.  Neither has Mr. Krane made whole his client,

26  Haim Saban, for the egregious breach of duty.

27  //

28  //

United States' Sentencing Memorandum/ – 12
CR08-296RSM & CR09-391RSM

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

## VI.  CONCLUSION

2

Attorneys as officers of the court should and are held to a high standard when it

3

comes to fulfilling their obligations under the law.  In this case, a wealthy tax attorney

4

betrayed his client to obtain tens of millions of dollars on which he sought to evade taxes.

5

Nothing excuses this behavior.  For the foregoing reasons, the United States respectfully

6

requests that the Court sentence Matthew Krane to a combined term of 50 months

7

incarceration, for both cases at issue, followed by two years of supervised release.

8

DATED this 16th day of May, 2011.

9

Respectfully submitted,

10

11

JENNY A. DURKAN
United States Attorney

12

/s/Robert Westinghouse
ROBERT WESTINGHOUSE
Assistant United States Attorney
WSBA #6484
700 Stewart Street, Suite 5220
Seattle, Washington 98101
Telephone: (206) 553-7970
Facsimile: (206) 553-2502
E-mail: Robert.Westinghouse@usdoj.gov

/s/ Katheryn Kim Frierson
KATHERYN KIM FRIERSON
Assistant United States Attorney
WSBA # 37794
700 Stewart Street, Suite 5220
Seattle, Washington 98101
Telephone: (206) 553-7970
Facsimile: (206) 553-2502
E-mail: Katheryn.K.Frierson@usdoj.gov

13

14

15

16

17

/s/ Michael Dion
MICHAEL DION
Assistant United States Attorney
WSBA # 31239
700 Stewart Street, Suite 5220
Seattle, Washington 98101
Telephone:  (206) 553-7729
Facsimile:  (206) 553-0755
E-mail: Michael.Dion@usdoj.gov

/s/ Jerrod C. Patterson
JERROD C. PATTERSON
Assistant United States Attorney
WSBA #43325
700 Stewart Street, Suite 5220
Seattle, Washington 98101
Telephone: (206) 553-1206
Facsimile:  (206) 553-0755
Email: Jerrod.Patterson2@usdoj.gov

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

CERTIFICATE OF SERVICE

I hereby certify that on May 16, 2011, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the attorney(s) of record for the defendant(s).  I hereby certify that I have served the attorney(s) of record for the defendant(s) that are non CM/ECF participants via facsimile.

s/Anna Chang
ANNA CHANG
Paralegal
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
Telephone:   (206) 553-7970
Facsimile:    (206) 553-2502
E-mail:  Anna.Chang@usdoj.gov

CERTIFICATE OF SERVICE